

www.millerlaw.nyc

Meredith R. Miller, Esq.

Miller Law, PLLC
167 Madison Avenue, Suite 503
New York, NY 10016

Tel: (347) 878-2587
Fax: (866) 495-6719
meredith@millerlaw.nyc

February 21, 2018

**Via ECF only**
The Honorable Alison J. Nathan
United States District Court for the
Southern District of New York
Thurgood Marshall U.S. Courthouse
40 Foley Square
New York, NY 10007

      Re:    ***Montalvo, et al. v. ARKAR, Inc., et al.,***
              **Docket No. 17-cv-06693 (AJN)**

Dear Judge Nathan:

      This firm represents Plaintiffs Dorian Montalvo, Gilberto Pamias, Giovanne Pagan, and Leonard Crisci III (collectively "Plaintiffs") in the above-referenced matter. Plaintiffs write jointly with Defendants in accordance with Rule 5(A) of Your Honor's Individual Practices to request that the Court approve the settlement agreement (the "Agreement"). The Agreement is submitted simultaneously with this letter as Exhibit 1 hereto, and the parties respectfully request that the Court approve the Agreement. Plaintiffs' counsel further requests that the Court approve our firm's attorneys' fees and costs.

      **I.**      **Introduction.**

      As Plaintiffs' claims arise, in part, under the Fair Labor Standards Act, 29 U.S.C. §§ 201 et seq. ("FLSA"), the Agreement must be approved by this Court. *See Cheeks v. Freeport Pancake House, Inc.*, 796 F. 3d 199 (2d Cir. 2015). In evaluating whether a proposed settlement is fair and reasonable, "a court should consider the totality of circumstances including, but not limited to, the following factors: (1) the plaintiff's range of possible recovery; (2) the extent to which the settlement will enable the parties to avoid anticipated burdens and expenses in establishing their respective claims and defenses; (3) the seriousness of the litigation risks faced by the parties; (4) whether the settlement agreement is the produce of arm's-length bargaining between experienced counsel; and (5) the possibility of fraud or collusion." *Wolinsky v. Scholastic Inc.*, 900 F. Supp. 2d 332, 335-336 (S.D.N.Y. 2012) (citations and quotation marks omitted).

      The Agreement reflects a desire by the parties to fully and finally settle Plaintiffs' Fair Labor Standards Act ("FLSA") and New York Labor Law ("NYLL") claims. The settlement in this case involves four Plaintiffs, each of whom assert wage and other employment-related claims arising from work that they performed as a superintendent and handymen at Defendants' apartment building located at 2025 Seward Avenue, Bronx, New York (the "Seward Ave Building").

## II. Plaintiffs' Claims for Unpaid Wages and Wage Statement Violations.

In a Complaint filed on September 1, 2017, Plaintiffs allege FLSA and NYLL violations and seek: (1) unpaid overtime, (2) repayment of illegal deductions (NYLL, Article 19, § 193, 12 N.Y.C.R.R. § 2.10(a)), (3) wage statement violations pursuant to NYLL § 195(3) and/or 198(1-b); (4) liquidated damages, and (5) attorneys' fees and costs. Plaintiffs allege that they were not paid for overtime hours despite a weekly work schedule that required each of them to work more than 40 hours per week.

### *Dorian Montalvo (Superintendent)*

Specifically, in the Complaint, Plaintiffs allege that, from approximately April 2015 to May 2017, Plaintiff Dorian Montalvo ("Montalvo") worked for Defendants as a superintendent at the Seward Ave Building. During this time, Montalvo alleges that he worked seven days per week, around the clock, to refurbish and upgrade the Seward Ave Building's systems and components, including but not limited to its roof. Montalvo alleges that he installed new kitchens in units when tenants moved out, tiled apartments, managed the boiler, interacted with police, cleaned elevator pits, and worked overnight during snowstorms to shovel snow.

Plaintiffs contend that Defendants paid Montalvo a flat weekly wage of $670.00, regardless of the number of days or hours that he worked during a particular week. In the Complaint, Montalvo alleges that he was not required to keep track of his time, nor did the Defendants utilize any time tracking device, such as punch cards, that accurately reflected his actual hours worked. Montalvo alleges that he regularly worked in excess of 40 hours per workweek and did not receive overtime compensation for hours worked in excess of 40 per week. Montalvo alleges that he worked, on average, approximately 70-80 hours over the course of a typical workweek during his employment with Defendants.

### *Gilberto Pamias, Giovanne Pagan and Leonard Crisci III (Handymen)*

Plaintiffs Gilberto Pamias ("Pamias"), Giovanne Pagan ("Pagan") and Leonard Crisci III ("Crisci") worked as handymen at the Seward Building. Pamias alleges he worked for Defendants from approximately May 2015 to May 2017. Pagan alleges he worked for Defendants from approximately April 2016 through April 2017. Crisci alleges he worked for Defendants from approximately May 2015 to May 2017. Pamias, Pagan and Crisci each allege that they worked an average of forty-five hours per week. In the Complaint, they allege that, when special projects arose, they would work as much as 60 hours per week. Defendants did not utilize any time tracking device or system to keep track of the hours that Pamias, Pagan and Crisci worked. Instead, Plaintiffs allege that Defendants would pay Pamias $440.00 per week with no compensation for the hours that Pamias worked beyond the first forty hours. Plaintiffs allege that Defendants would pay Pagan $450.00 per week with no compensation for the hours that Pagan worked beyond the first forty hours. Plaintiffs allege that Defendants would pay Crisci $520.00 per week with no compensation for the hours that Crisci worked beyond the first forty hours.

### *Summary of Alleged Damages and Defenses*

While, through the process of extensive negotiation, the parties were able to clarify and agree on certain basic facts, Plaintiffs and Defendants still have wide disagreements about the amount of hours Plaintiffs worked. Plaintiffs allege that they were not provided with any opportunity to report the number of hours that they worked each day, and that in the absence of records, adjudication of overtime would largely be based on the credible recollections of Plaintiffs. Defendants maintain that Plaintiffs worked fewer hours than they are claiming in the Complaint and that the hours alleged cannot be supported based on testimony from others who saw them start and end their workdays. Defendants also maintain that Montalvo was a janitor and, thus, not entitled to overtime pay pursuant to the Minimum Wage Order for the Building Service Industry, 12 NYCRR 141. In addition, the parties disagree about whether Plaintiffs are entitled to liquidated damages and overtime at a rate of time and one half. Defendants maintain that if Plaintiffs were to somehow prevail, that they would be entitled only to half-time for any overtime hours as there was an agreement that Plaintiffs acknowledged that their weekly pay was for all hours worked. Defendants further maintain that Plaintiffs overstate their length of service and/or their claims for the hours that they worked throughout their employment. Defendants deny wage violations and contend that if any such violations exist, they would not warrant liquidated damages because they believed in good faith that they were in compliance with the law.

To the extent that Plaintiffs were asked to perform "special projects," such as apartment repairs, the parties disagree about whether and how Plaintiffs were to be paid for that time. Plaintiffs claim that work on special projects was not included by Defendants for purposes of calculating overtime, and Plaintiffs were not properly paid for this time. Defendants claim that special projects, if any, were specifically invoiced and paid separate and apart from wages. Defendants state that Plaintiff Montalvo would estimate the time, labor and materials required for such projects and then invoice Defendants based on such estimates, which Defendants would then pay. Defendants maintain that they never directed or required Plaintiffs to work on special projects. Plaintiffs dispute that payment was made and assert that Defendants could not properly treat Plaintiffs as independent contractors rather then employees solely for these purposes. Further, Plaintiffs maintain that, assuming this was Defendants' practice, it (i) could serve to increase Plaintiffs' overtime rates and (ii) could, to the extent Montalvo was expected to, in turn, pay helpers on projects, constitute wage theft.

Plaintiffs presented a detailed explanation of the overtime calculation to Defendants' counsel and, after discussion and clarification by Defendants concerning amounts Plaintiffs were paid, as well as start and end dates of employment, Plaintiffs computed their total overtime calculation at $118,000 for unpaid overtime, not including liquidated damages. In addition, Plaintiffs allege wage statement violations pursuant to NYLL § 195(3) and/or 198(1-b), which total $5,000 per Plaintiff, or $20,000 total.

To the extent that compensation for special projects became difficult to quantify exactly, for the purposes of settlement discussions, they were estimated and calculated as part of overall overtime hours. Thus, for purposes of settlement negotiations, the estimated average weekly

overtime Plaintiffs presented to Defendants was 35 hours for Montalvo and 5 hours for the other Plaintiffs.

Based on these estimates, Plaintiffs calculated Montalvo's unpaid overtime as follows: Montalvo's weekly rate of pay was $667, which is $16.67 for the first 40 hours of work per week and yields an overtime rate (time and ½) of $25.00 per hour. An average weekly overtime of 35 hours totals $875 of unpaid weekly overtime. Since Montalvo is estimated to have worked 110 weeks for Defendants, his total unpaid overtime was estimated to be $96,250.

Plaintiffs calculated Pamias's unpaid overtime as follows: Pamias's weekly rate of pay was $440, which is $11.00 for the first 40 hours of work per week and yields an overtime rate (time and ½) of $16.50 per hour. An average weekly overtime of 5 hours totals $82.50 of unpaid weekly overtime. Since Pamias is estimated to have worked 86 weeks for Defendants, his total unpaid overtime was estimated to be $7,095.00.

Plaintiffs calculated Pagan's unpaid overtime as follows: Pagan's weekly rate of pay was $450, which is $11.25 for the first 40 hours of work per week and yields an overtime rate (time and ½) of $16.87 per hour. An average weekly overtime of 5 hours totals $84.35 of unpaid weekly overtime. Since Pagan is estimated to have worked 56 weeks for Defendants, his total unpaid overtime was estimated to be $4,723.60.

Plaintiffs calculated Crisci's unpaid overtime as follows: Crisci's weekly rate of pay was $520, which is $13.00 for the first 40 hours of work per week and yields an overtime rate (time and ½) of $19.50 per hour. An average weekly overtime of 5 hours totals $97.50 of unpaid weekly overtime. Since Crisci is estimated to have worked 104 weeks for Defendants, his total unpaid overtime was estimated to be $10,140.00.

Upon reviewing Plaintiffs' calculations, Defendants conducted their own analysis of the alleged wages owed. Using the half-time method for calculation, the overtime exposure under this methodology would amount to an estimated $39,409.75 in unpaid overtime for all Plaintiffs.

After the parties exchanged their calculations in detail with one another, the parties engaged in serious communications over a series of phone calls, intended to foster common ground about basic issues. The parties still disagreed as to the number of overtime hours the Plaintiffs worked and methodology of the pay rate to be employed for overtime, making it apparent that any further clarity would necessitate costly depositions of all parties (as well as non-parties), and it was far from clear that results of such proceedings would be beneficial to Plaintiffs. Plaintiffs and Defendants arrived at a settlement amount that compromised on the number of estimated overtime hours and pay for each of the Plaintiffs and, therefore, took into account the challenges and risks to both sides.

### III. Unlawful Deduction/ Wage Theft

Plaintiffs further allege that Defendants violated NYLL by requiring Plaintiffs to provide their own "tools of the trade," including work tools, without reimbursement. There appears to be some uncertainty about whether some or all of these expenses were reimbursed. The settlement

reflects Plaintiffs' determination that establishing these wage theft clams would be challenging and the amount of damages difficult to establish.

### IV. The Agreement is Fair and Reasonable.

The parties represent to the Court that the Agreement between the parties is a fair and reasonable resolution of a *bona fide* dispute reached as a result of extensive negotiation over a period of months. For settlement purposes, counsel for Plaintiffs provided counsel for Defendants with a preliminary demand and a chart of approximate hours detailing that calculation. Thereafter, counsel for Plaintiffs and Defendants conferred by telephone on October 30, 2017. Plaintiffs' counsel revised the calculation according to the parties' discussion. Thereafter, counsel for Plaintiffs and Defendants conferred by telephone on November 6, 2017 and again on December 6, 2017 and December 26, 2017 to discuss settlement. Each telephone call lasted approximately one half hour and included several follow up emails. In sum, the Agreement is the product of meaningful and serious negotiations.

As reflected in the attached Agreement, the parties have agreed to settle the case for a total of $95,000.00 (the "Settlement Amount"), inclusive of attorneys' fees and costs, to be paid in full within fifteen days of Court approval.

Based on Plaintiffs' breakdown, after attorneys' fees and costs, each Plaintiff would receive $5,000, plus a percentage of the remaining Settlement Amount ($47,947.84). Each Plaintiff's percentage of the Settlement Amount was apportioned according to the estimate of his relative value of his unpaid wage claim. This, in turn, was calculated on the basis of the relative length of time of their employment with Defendants, their respective overtime rate(s), and estimated number of unpaid overtime hours that they claim to have worked. The percentages were adjusted only slightly based on the availability of evidence to prove each Plaintiff's claim. These percentages were calculated as follows:

- o Dorian Montalvo: 72% or $34,522.46
- o Gilberto Pamias: 11% or $5,274.26
- o Giovanne Pagan: 8% or $3,835.82
- o Leonard Crisci III: 9% or $4,315.30

Thus, when adding the $5,000 for wage statement violations to each amount, Plaintiffs will each receive:

- o Dorian Montalvo: $39,522.46
- o Gilberto Pamias: 11% or $10,274.26
- o Giovanne Pagan: 8% or $8,835.82
- o Leonard Crisci III: 9% or $9,315.30

These amounts are to be paid in two checks: (i) half from which estimated deductions will be made for taxes and other withholdings, and for which a W-2 tax form will be issued and (ii) half from which no withholding, deduction or setoff shall be made, and for which an IRS form 1099 was provided.

The relatively large portion (42%) of the total Settlement Amount that is apportioned to Plaintiff Dorian Montalvo reflects several factors, including: (a) as a superintendent (rather than a handyman) he worked longer hours that included substantial on-call time; (b) his premium overtime hourly rate of pay was higher than that of the other Plaintiffs because his flat weekly salary ($667 per week) was substantially higher than the salaries of the other Plaintiffs[1]; (c) he worked approximately 110 weeks, which was more than any other Plaintiff.

Plaintiffs have all agreed to these percentages as fair and have consented to this apportionment of the Settlement Amount. They understand that the alleged overtime hours worked are in dispute and will require extensive litigation to prove, with unpredictable results.

Plaintiffs' counsel is seeking a contingent fee of 28% ($26,424.16) of the net proceeds of settlement, which is far below the 33.3% contingency fee provided by the retainer agreements (Exhibit 2). Given the early stage of the case, Plaintiffs' costs/disbursements were minimal, totaling $628.00.

We believe that the Settlement Amount is fair and reasonable in light of the uncertainties associated with establishing Plaintiffs' precise amount of overtime hours. *See Beckert v. Rubinov*, 15 Civ. 1951 (PAE), 2015 WL 8773460, at *2 (S.D.N.Y. Dec. 14, 2015)(finding that the "amount [plaintiff] would receive under the Agreement ($29,557.97) is a substantial proportion of the maximum possible recovery he identifies ($114,700)").

Here, the parties were able to reach an agreement before incurring the costs of court appearances, depositions, motion practice and trial. *See Burgos v. San Miguel Transp., Inc.*, 2016 U.S. Dist. LEXIS 166248, *6, 2016 WL 7015760 (S.D.N.Y. Dec. 1, 2016)(citing the relatively early stage of the case as one of the factors supporting the fairness of a settlement that was substantially below the amount that plaintiff initially contemplated). Furthermore, here, as in *Burgos*, there is no assurance that Plaintiffs could be awarded liquidated damages under FLSA or NYLL if this matter were to proceed to trial.

### V.     Application for Attorneys' Fees.

Under both the FLSA and NYLL, Plaintiffs are entitled to recover attorneys' fees and costs. Attorneys' fees in FLSA settlements are examined to ensure that the interests of plaintiff's counsel in his or her own compensation did not have an adverse impact on the extent of relief counsel obtained for the client. *See Wolinsky*, 900 F.Supp.2d at 336.

Plaintiffs' counsel represents Plaintiffs on a contingent basis, pursuant to retainer agreements, which provide for attorneys' fees of one-third of the net recovery. Copies of the retainer agreements are attached hereto as Exhibit 2. Co-counsel Rapaport Law Firm's time spent on this matter and the expenses reasonably incurred are set forth in the accurate, detailed and contemporaneous records attached hereto as Exhibits 3. Exhibit 4 is the history bill of Miller Law, PLLC. Given that the parties were able to reach an early settlement, the lodestar in the attached billing records (Exs. 3 and 4) is less than the amount of fees requested. This is precisely

---

[1] By way of comparison, the weekly salaries of the other Plaintiffs were as follows: (a) Gilberto Pamias - $440.00; (b) Giovanne Pagan - $450.00 and (c) Leonard Crisci III - $520.00.

why Plaintiffs' counsel has significantly discounted the fee from the agreed 33.33% to 28% (a 15% discount), even though contingency fees of one-third are routinely approved in this Circuit. *Sierra v. Mid City Gym and Tanning LLC*, No. 16 Civ. 2892, 2017 WL 4862070 *4 (S.D.N.Y. Oct. 25, 2017); *In Gaspar v. Personal Touch Moving, Inc.,* No. 13 Civ. 8187, 2015 WL 7871036 *2 (S.D.N.Y. Dec. 3, 2015).

The attorneys and staff who were involved in this case, and whose time is reflected in the attached billing records, are:

1. **Marc Rapaport (Rapaport Law Firm, PLLC).**

    Marc Rapaport is the managing member of Rapaport Law Firm, where he began his practice in 1995. He has more than twenty years of experience litigating employment matters on behalf of employees in New York. He received a J.D. from Georgetown University Law Center in 1992. Thereafter, he worked as a Staff Attorney for the United States Department of Justice in Washington, D.C. He represent employees in a broad range of discrimination and wage/hour matters. He is an active member of the National Employment Lawyers Association and the National Employment Lawyers Association New York. He believes that his clients also benefit from his broader experience beyond the field of employment law, including his experience litigating commercial disputes in state and federal courts.

    For more than 20 years, he has endeavored to represent immigrant workers who often find it difficult to obtain skilled legal representation. In recent years, he has particularly focused on representing immigrant workers (superintendents and porters) in the building service industry, which have included, by way of example, the following matters: Armas et al. v. SKYC Management LLC et al., 2014 CV 6360 (PGG)(HBP); Castillo et al. v.140 Ash Associates, LLC, et al., 16-cv-5216 (FB)(PK); Salas et al. v. Phoenix ACV Construction Services, LLC et al., 16-cv-08066 (LAP); and Flores et al. v. Claremont Properties, 17-cv001316 (KBF). His requested hourly rate of $400.00 has been approved by multiple judges in the Second Circuit.

2. **Meredith R. Miller (Miller Law, PLLC; of counsel to Rapaport Law Firm, PLLC).**

    Ms. Miller has served as Of Counsel to Rapaport Law Firm for more than twelve years. She received a J.D. from Brooklyn Law School in 2000. Thereafter, she started her legal career in Albany, clerking for the New York Court of Appeals. She then served as a litigation associate at Proskauer Rose, LLP in New York City. In 2004, she accepted a teaching fellowship at Temple Law School in Philadelphia, which began her career as a law professor. Ms. Miller teaches contract, business and employment law at the Touro College, Jacob D. Fuchsberg Law Center in Long Island, New York. She has written and lectured extensively on these subjects. Additionally, she has served as co-counsel with Mr. Rapaport on about a dozen cases representing immigrant workers (most often superintendents and porters in the building service industry). Her requested hourly rate of $400.00 has been approved by multiple judges in the Second Circuit.

3. **<u>Ana Alcantara (Rapaport Law Firm, PLLC).</u>**

Ms. Alcantara has been a paralegal at Rapaport Law Firm since November 2017. Ms. Alcantara graduated from SUNY Plattsburgh with a B.S. Ms. Alcantara speaks fluent Spanish. Because of her language skills, Ms. Alcantara serves a crucial and effective role in our representation of wage & hour plaintiffs.

We respectfully request that the Court approve the Agreement, as well as the amount of legal fees requested herein. Should Your Honor have any questions or concerns regarding this settlement, the parties are happy to discuss them. The parties thank the Court for its attention to this matter.

Respectfully yours,

Meredith R. Miller

Encls. (Exhibs 1 – 4)

cc: Yale Pollack, Esq. (*Via ECF only*)